In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-2101

ANNETE M. ALLEN, SHELLEY S. BURNETTE, RAHPRE
   NEWBERRY, and EARNEST LEONARD,

*Plaintiffs-Appellants,*

*v.*

CHICAGO TRANSIT AUTHORITY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 7614—**Suzanne B. Conlon**, *Judge.*

ARGUED SEPTEMBER 24, 2002—DECIDED JANUARY 6, 2003

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.*  Four black employees of the Chi-
cago Transit Authority charge racial discrimination (two
of the plaintiffs also charge retaliation for complaining
about discrimination) by their employer in violation of
Title VII and related statutes. The district court granted
summary judgment for the defendant.

We begin with the two women, Allen and Burnette, per-
sonnel specialists who sought promotion to manage-
rial positions in their department and were passed over

in favor first of a white man named Lebron in 1995 and two years later in favor of another white man, named Reilly, who had only recently become a personnel specialist. Lebron's promotion was not within the 300-day statute of limitations for a Title VII claim, 42 U.S.C. § 2000e-5(e)(1), and so the district court held the women's complaint about his being promoted ahead of them to be time-barred. That was an error. Until they were again passed over in favor of a white person, they had no reason to believe that race had played a role, for Lebron unlike Reilly was not a surprise choice. Equitable tolling delays the running of the statute of limitations until the plaintiff by exercise of due diligence should have realized that he had a claim. See *National R.R. Passenger Corp. v. Morgan*, 122 S. Ct. 2061, 2072 (2002); *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1143-44 (7th Cir. 1992); *Brennan v. Daley*, 929 F.2d 346, 349 (7th Cir. 1991). That did not occur in this case until Reilly's promotion.

The general manager of the department, Tapling, made the appointments and was the defendant's key witness with regard to the Allen and Burnette claims. Regarding Lebron's promotion, she testified that Allen's lack of a master's degree precluded her from consideration for the job—yet on the interview form Tapling had rated Allen's education "suitable" for the job. Regarding the Reilly promotion, Tapling told investigators from the CTA's affirmative action unit and the Illinois human rights agency that although the two women had far more experience than Reilly, having been personnel specialists for a decade or more and he for just two years, he had more initiative as shown by his having worked overtime on at least 16 days in a two-month period in order to learn a new photo ID computer system, whereas Allen and Burnette were reluctant to work overtime. However, the CTA's time sheets showed that Reilly stayed late on only three days

during the two-month period, and all were days on which he had started work late, and that Allen and Burnette put in at least as much extra time as Reilly. Tapling's boss testified that Reilly got the job because he interviewed better than Allen or Burnette—but Tapling testified that there were no interviews.

There is more. Tapling had told the investigators that she had passed over Allen because of too many absences, lack of maturity, and lack of a master's degree (which Reilly had). But at her first deposition she testified that Allen's absences had played no role in her decision; and the CTA's records did not sustain the charge that Allen had unexcused absences. At her second deposition, Tapling backtracked, saying she was no longer confident that absences had not been a factor in her passing over Allen. In a subsequent affidavit, she belatedly accused Allen of excessive absenteeism. Regarding Allen's maturity, she said that once Allen had come crying to her after being abused by another employee—but Allen was not at work on the day of the alleged abuse.

Although Reilly had a master's degree and the women did not, the master's degree was not in human relations but in communications, and the managerial job to which Tapling appointed him did not require a master's degree. Tapling accused Burnette of "theft" for having run up a bill of $140 for personal long-distance calls. But Burnette was not disciplined (she reimbursed the CTA), and another employee who committed the identical "theft" and also was not disciplined for it was promoted.

When a qualified black person is passed over for a promotion in favor of a white, and the employer offers a noninvidious reason that a jury would be free to disregard because the genuineness of the reason has been challenged by substantial evidence, summary judgment for the employer is improper. E.g., *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 146-49 (2000); *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002); *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291-92 (7th Cir. 1999); *Mills v. Health Care Service Corp.* 171 F.3d 450, 458 (7th Cir. 1999). Tapling offered noninvidious reasons for promoting Lebron and then Reilly rather than either Allen or Burnette, but a jury would be entitled to find that the reasons she offered were lies. When a witness repeatedly contradicts himself under oath on material matters, and contradicts as well documentary evidence likely to be accurate (the time sheets, for example, whose reliability was attested by several witnesses), the witness's credibility becomes an issue for the jury; it cannot be resolved in a summary judgment proceeding. *Perfetti v. First National Bank*, 950 F.2d 449, 456 (7th Cir. 1991); *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 575 (7th Cir. 1987).

It is not even clear what it would mean to say that the district court was entitled to treat Tapling's testimony as gospel truth—does this mean that Allen's absences played a role in Reilly's promotion, or played no role? Tapling said both things under oath. The insouciance with which the defendant treats Tapling's possibly dishonest testimony is in ironic contrast with its insisting, as we shall see that it does, that plaintiff Leonard's perjury at his deposition should bar his claim altogether.

The district court refused to give any weight to the finding by the CTA's own investigator that Tapling's explanation for Reilly's promotion was not credible. This was another error. The finding was admissible as an admission made by an employee of a party opponent within the scope of his employment, Fed. R. Evid. 801(d)(2)(D); *Stagman v. Ryan*, 176 F.3d 986, 996 (7th Cir. 1999), and as an investigative report of a public agency. Fed. R. Evid. 803(8)(C); *Tuohey v. Chicago Park District*, 148 F.3d 735, 739-

40 (7th Cir. 1998). How much weight to give such admissions (for they are evidentiary rather than judicial admissions and hence not binding, *id.* at 740; see also *Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000)) is for the jury to decide, not the judge in ruling on a motion for summary judgment.

So the grant of summary judgment against Allen and Burnette must be reversed, and we move on to Newberry. He was a computer programmer and complains primarily that like Allen and Burnette he was passed over for a promotion in favor first of one white person, Otto, and then of another, Goyal. Otto, however, was promoted only in the sense of being given a higher rank and salary; rather than fill a vacancy, he continued in the same job that he had had before his promotion. For Newberry to have been given Otto's "promotion" would have meant bouncing Otto from a job that he had been performing adequately, indeed with sufficient distinction to warrant a promotion. As for the job that Goyal obtained, Newberry probably failed to show that he was qualified to perform the duties of the job, and certainly failed to show that he was as well qualified as Goyal.

There is no other evidence that the denial of the promotions was racially motivated. It is true that, like Allen and Burnette, Newberry submitted a report by a CTA investigator. But the report is not probative. It was written before the two promotions that Newberry claims he was denied for racial reasons, and it contains no evidence concerning his qualifications for the promotions relative to the qualifications of Otto and Goyal, nor any other evidence bearing on the employer's motivation.

Newberry also claims that he was a victim of harassment. He alleged that the motive behind the harassment was the fact that he had complained about discrimination and

on the basis of this allegation the district court ruled that Newberry was charging retaliation and that he could not do this because he had failed to file a complaint of retaliation with the EEOC. Discrimination and retaliation are separate wrongs, as is obvious in cases (which this case is not, however) in which the person retaliated against is not a member of the group that is the target of the alleged discrimination. It is the motive for, rather than the character of, the actions taken against the employee that determines whether the claim is one of retaliation. See *Heuer v. Weil-McLain*, 203 F.3d 1021, 1024 (7th Cir. 2000); *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 26 (1st Cir. 2002). If a black employee, such as Newberry, is discriminated against, complains, and then is further discriminated against, the further discrimination being motivated however by the complaint rather than by the employee's race as such, that further discrimination is discrimination against complainers rather than against blacks; for a white who complained would be treated the same way.

The judge thus properly barred Newberry from pressing his claim for retaliation; and Newberry has forfeited any claim of racial harassment by failing in his brief in this court to indicate in even a minimally coherent manner (see *Jones Motor Co. v. Holtkamp, Liese*, 197 F.3d 1190, 1192 (7th Cir. 1999); *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 593 (7th Cir. 1992); *Karibian v. Columbia University*, 14 F.3d 773, 777 n. 1 (2d Cir. 1994)) what acts he contends were acts of harassment motivated by his race and whether they added up to a materially adverse employment action, which must be shown for employment discrimination to be actionable under Title VII. See, e.g., *Herrnreiter v. Chicago Housing Authority*, No. 01-3202, 2002 WL 31886684, at *1 (7th Cir. Dec. 30, 2002). Newberry complains that the district judge did not give him time

to complete discovery, but there is no merit to that complaint; the judge found, not unreasonably, that Newberry's lawyer had frittered away the time that he had been given for conducting discovery. See *United States v. All Assets & Equipment of West Side Building Corp.*, 58 F.3d 1181, 1190-91 (7th Cir. 1995).

We come last to Leonard, an employee in the CTA's printing shop who alleges numerous acts of retaliation for his numerous complaints of discrimination. The alleged retaliatory acts were various disciplinary measures, such as warning letters and suspensions, for various infractions. His claim is fatally undermined by uncontroverted evidence of infractions and discipline prior to his complaints not offset by any evidence that might nevertheless convince a reasonable jury that had it not been for his complaints, he would not have been disciplined as often or as severely as he was. We give some examples of the discipline alleged to be retaliatory to which he was subjected:

1. He was transferred to a lower-paid job operating a different machine after a fight with another worker. He does not deny that the fight took place, and since the other worker was permanently assigned to the original machine, while Leonard was working there only temporarily, no inference of retaliation can be drawn from the fact that the employer separated the fighters by moving Leonard.

2. He admits that the reason for a two-day suspension was his refusal to cut paper. He says that he simply demanded to be paid appropriately for the work and that his union representative was there as a witness. The representative said that Leonard's supervisor became enraged and screamed at Leonard. No matter; Leonard's own description of the incident indicates that the cause of the suspension was the employer's irritation (whether warranted

or not) with Leonard and the union about their making
what the supervisor regarded as a fuss over the correct pay
for cutting paper.

3. A five-day suspension occurred after Leonard and
several other workers had reported four hours of overtime
instead of the three they worked. All the employees were
disciplined identically.

4. Leonard's best evidence of retaliation involves the 12-
month probation on which he was placed after he got
into another fight with the worker mentioned in para-
graph 1 above, who by this time however was a supervisor.
Leonard claims that the fight was merely a "discussion."
But whether it was an actual fight (as the history suggests)
or Leonard was simply mouthing off at the supervisor,
we do not think that, given all the uncontradicted evi-
dence of Leonard's chronic insubordination, a reasonable
jury could find that the suspension was motivated by his
complaints of discrimination.

Two issues relating to Leonard's claim merit further
discussion, however. They arise from the same incident,
namely an act of perjury at his deposition, where he
claimed to have recorded certain conversations that he con-
tended supported his charge of retaliation. He later admit-
ted that he had not recorded them. The statement in his
deposition was a lie and was material, and so it was in-
deed perjurious. By way of sanction the district court
ordered Leonard to pay the defendant, in ten installments
of $400 each, $4000, representing the defendant's legal
expense caused by the lie. (Leonard challenges the order,
but his challenge has no merit.) This was before the court
entered summary judgment for the defendant. When
Leonard was late in paying the first installment, the de-
fendant moved to dismiss the suit as a sanction for the
default. The judge denied the motion without explana-

tion after Leonard finally paid the installment. Leonard continued paying for a time, but after he reached $2000 he stopped, informing the court that he couldn't afford to pay any more, though he later paid another $200. As of September 24, 2002, when this case was argued, he still owed $1800 and we assume he still does as otherwise we would certainly have heard from his lawyer. The defendant asks us to dismiss Leonard's appeal as a sanction for his continuing disobedience of the district court's order to pay.

Willful disobedience of a judicial order is contempt of court, and among the sanctions that may be appropriate for such contempt is barring an appeal from the judgment in the litigation in which the order was issued. This would not be appropriate if the order had been disobeyed before the district court entered its judgment, for then that court would be in the best position to mete out an appropriate sanction. But that is not quite this case, as the defendant is complaining to us about Leonard's continuing contumacy after the appeal was filed and the district judge thus had lost jurisdiction.

A willful failure to pay fees due in the trial court or fines or other monetary sanctions imposed by that court strikes us as a reasonable ground for dismissing an appeal, with the effect of dismissing the appellant's suit. But not in this case, as there has been no determination that Leonard's continuing failure to pay is willful, which it is not if he simply does not have any money. His lawyer tells us that Leonard is unemployed and bankrupt; this is of course entirely possible though we cannot be certain of it because, to repeat, there has been no evidentiary hearing. We could remand with directions to the district court to conduct such a hearing, or we could instead appoint a special master to conduct a hearing in this court, but

there is no point in embarking on either course since Leonard's appeal has in any event no merit.

The defendant also argues that even if Leonard had paid the fine in full and had presented evidence of retaliation, we would have to affirm because of his perjury. There are two ways to characterize such an argument. The first is that perjury should estop a litigant to continue litigating the claim out of which the perjury arose. The second is that perjury warrants disbelieving all the perjurious litigant's testimony.

The first position is untenable if stated as a rule rather than an option. We noted that the district judge had in effect fined Leonard $4000 for his perjury; there are also of course criminal sanctions for perjury, although they are rarely invoked; and an alternative to either a monetary or a criminal sanction might indeed be to throw out the perjurious litigant's case. *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 695 (8th Cir. 2001); cf. *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 306-07 (7th Cir. 2002). Perjury committed in the course of legal proceedings is a fraud on the court, and it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case.

This would depend on the circumstances, however. *In re Hall*, 304 F.3d 743, 748-49 (7th Cir. 2002). In general the severity of a sanction should be proportioned to the gravity of the offense, *Bolt v. Loy*, 227 F.3d 854, 856-57 (7th Cir. 2000); *Lorenzen v. Employees Retirement Plan of the Sperry & Hutchinson Co.*, 896 F.2d 228, 232-33 (7th Cir. 1990), and while perjury is a serious offense, one can imagine cases in which a sanction of dismissal would be excessive. Suppose the opposing litigant had perjured himself as well. Or suppose the perjury was clumsily committed and quickly discovered, as indeed happened here. If the per-

jury were harmless so far as affecting the course of the litigation was concerned, it might still be deserving of criminal punishment yet dismissal might be excessive from the perspective of a civil litigation. See *Shepherd v. American Broadcasting Cos., Inc.*, 62 F.3d 1469, 1480 (D.C. Cir. 1995). This may be such a case, though we need not decide, since, to repeat, Leonard's claim must be rejected in any event.

Nor, if the fell sanction of dismissal is rejected, does perjury warrant disregarding a witness's entire testimony as a matter of law. It undermines the witness's testimony; but obviously there are cases, perhaps the majority, in which a witness's testimony is a compound of truth and falsity. Perjury is a circumstance to be weighed by the jury in determining a witness's credibility rather than a ground for removing the issue of credibility from the jury by treating the witness's entire testimony as unworthy of belief. *Piraino v. International Orientation Resources, Inc.*, 137 F.3d 987, 991 n. 2 (7th Cir. 1998); *United States v. Kuzniar*, 881 F.2d 466, 471 (7th Cir. 1989); *United States v. Kelly*, 349 F.2d 720, 780 (2d Cir. 1965); *Shelton v. United States*, 169 F.2d 665, 667 (D.C. Cir. 1948). It simply is not a reasonable inference from a falsehood in one part of a witness's testimony to the falseness of the entire testimony.

So: the dismissal of the claims of Allen and Burnette is reversed and that part of the case returned to the district court for trial, but the dismissal of Newberry's and Leonard's claims is affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*