In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 06-2148

ESTEBAN MONTAÑO, DAVID MENDEZ, JULIO PERALES,
RICARDO RUIZ, and YESENIA MENDEZ,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 8035—**Samuel Der-Yeghiayan**, *Judge.*

————————

ARGUED JUNE 7, 2007—DECIDED JULY 23, 2008

————————

Before BAUER, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge.* This civil-rights suit against the City of Chicago and several of its police officers is before this court for the third time. The plaintiffs seek recovery for injuries they received when police confronted and forcibly arrested them during Mexican Independence Day festivities in Chicago in September 1997. They asserted numerous claims for relief against the City and the individual officers under 42 U.S.C. § 1983 and several state-law theories. The case has been before four

different district court judges and three appellate panels and has a correspondingly long and complicated procedural history. We will simplify the litigation story where we can.

The last time the case was here, we vacated the district court's dismissal of the plaintiffs' federal and state-law claims as procedurally improper and remanded for further proceedings. On remand, the district court again dismissed the claims, this time as a sanction for abuse of the judicial process, specifically, perjury by some of the plaintiffs. The plaintiffs now appeal that order and also seek review of two earlier orders granting: (1) mid-trial, a Rule 50(a) judgment as a matter of law in favor of six officers on certain of the false-arrest, excessive-force, and unlawful strip-search claims under § 1983; and (2) summary judgment in favor of the City on the plaintiffs' claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and in favor of seven officers on various false-arrest and failure-to-intervene claims.

We affirm in part and reverse in part. Summary judgment was properly granted on the *Monell* claim and the false-arrest and failure-to-intervene claims. As the officers now concede, however, the entry of the Rule 50(a) judgment was improper; with two exceptions discussed below, there was sufficient evidence to submit those claims to the jury. Finally, as to the claims that survived the Rule 50(a) judgment but were mistried and later dismissed as a sanction for perjury, we agree with the plaintiffs that the imposition of this penalty was unwarranted. The district court's perjury findings were entirely conclusory and failed to correspond to the legal definition of perjury. The supposed instances of perjury identified by the court—certain inconsistencies between

the plaintiffs' deposition and trial testimony—amounted to impeachment evidence but nothing more.

## I. Background

The plaintiffs allege flagrant mistreatment by Chicago police officers during and after the celebration of Mexican Independence Day in Chicago's Little Village neighborhood on September 14, 1997. The five plaintiffs were forcibly arrested and jailed following an altercation between officers and several celebrants on the corner of 25th and Whipple. The plaintiffs describe the incident as a violent police-initiated beating followed by illegal arrests and strip searches at the station house; the City and the officers deny any wrongdoing. A more detailed description of the incident (some of which was caught on videotape by a bystander) and the detentions that followed it can be found in our earlier opinion in this case, *Montaño v. City of Chicago*, 375 F.3d 593, 594-95 (7th Cir. 2004) ("*Montaño I*"), and will not be repeated here. To understand the present appeal, however, we think it necessary to recount the messy procedural history of this long-running lawsuit.

In November 1997 the plaintiffs filed a nine-count complaint against 16 (later amended to 21) officers and the City of Chicago. Five counts (excessive force, false arrest, malicious prosecution, failure to intervene, and conspiracy) were federal claims under 42 U.S.C. §§ 1983 and 1985, including a count against the City based on *Monell*; the other four were related state-law claims. After initially being assigned to Judge Aspen and then transferred to visiting Judge Moody in September 1998, the case was transferred again in November 2000, this time

to visiting Judge O'Meara. On September 25, 2001, the court granted summary judgment to the City on the *Monell* claim and to individual officers on many of the federal claims.[1] The court also relinquished jurisdiction over the state-law claims, which the plaintiffs promptly refiled in state court.

The federal claims left standing—for use of excessive force (against Officers Atilano, LaFrancis, Toolis, and Lopez), false arrest (against Officers Atilano and LaFrancis), and unlawful strip search (against Officers Maduzia and Lambert)—proceeded to jury trial in November 2001 but got no further than the close of the plaintiffs' case-in-chief. The district court granted the officers' motion for judgment as a matter of law pursuant to Rule 50 of the *Federal Rules of Civil Procedure* on all but two counts. The court then declared a mistrial on the two remaining counts: Montaño's excessive-force claim against Officer Lopez and Yesenia Mendez's strip-search claim against Officer Lambert. Before the two claims could be retried, however, the court stayed the case pending resolution of the state-court proceedings.

In December 2001 the plaintiffs appealed the summary judgment and the Rule 50 judgment, but a motions

---

[1] Seven officers were granted summary judgment on all claims based on their complete or partial lack of involvement in the plaintiffs' arrest and detention; all remaining officers were granted summary judgment on the § 1983 and § 1985 claims for malicious prosecution, conspiracy, and denial of medical treatment. Five officers (Zalewski, Predis, Skol, Maresso, and Tamez) were also granted summary judgment based on their qualified immunity from plaintiff Yesenia Mendez's false-arrest and excessive-force claims, and the false-arrest claims of Julio Perales, Ricardo Ruiz, and David Mendez.

panel of this court dismissed the appeal as premature. *Montaño v. City of Chicago*, Nos. 01-4284 & 02-1034, Ct. Order 2 (7th Cir. Mar. 20, 2002). The panel also dismissed the plaintiffs' challenge to the stay order because their notice of appeal failed to specifically mention it. *Id.*; *see* FED. R. APP. P. 3(c)(1)(B). Finally, the motions panel dismissed the officers' untimely cross-appeal of the stay order and the order declining supplemental jurisdiction over the state-law claims. *Montaño v. City of Chicago*, Nos. 01-4284 & 02-1034, Ct. Order 2-3 (applying *Abbs v. Sullivan*, 963 F.2d 918, 925 (7th Cir. 1992)). On March 19, 2002, the district court *sua sponte* dismissed the two remaining federal claims without prejudice pending resolution of the state-court proceedings. The court refused the officers' request to vacate that dismissal order and the earlier order relinquishing supplemental jurisdiction over the state-law claims. The officers appealed and a different panel of this court addressed these issues in *Montaño I*.

The first order of business in *Montaño I* was to resolve some thorny issues of appellate jurisdiction. 375 F.3d at 597-99, 601. On the merits we sided with the officers and vacated both the March 19 order dismissing the surviving federal claims and the September 25 order relinquishing jurisdiction over the state-law claims. *Id.* at 602. The result was the reinstatement of Montaño's excessive-force claim, Yesenia Mendez's strip-search claim, and all of the state-law claims. We also ordered the case reassigned on remand pursuant to Rule 36 of the *Circuit Rules of the U.S. Court of Appeals for the Seventh Circuit*. *Id.*

The case was reassigned to Judge Der-Yeghiayan. Ten months later the officers moved for dismissal as a sanc-

tion against the plaintiffs and their attorney. They claimed the plaintiffs committed perjury and fabricated certain testimony, and their attorney knowingly offered such testimony and engaged in other misconduct during the jury trial. In addition to dismissal, the officers sought an award of attorney's fees and costs against the plaintiffs' attorney pursuant to 28 U.S.C. § 1927.

Invoking its inherent power, the district court granted the motion for dismissal, concluding that a "drastic sanction is warranted . . . because if Plaintiffs' fraud upon the court were successful it would have had a tremendous impact on the trial and . . . the lives of the [accused] officers." The court further noted that "[t]here was not simply an isolated instance of perjury, but rather . . . a coordinated effort by Plaintiffs to present a false version of the events . . . to support their case." Although the judge dismissed what remained of the plaintiffs' case, he declined to sanction their attorney. Judge Der-Yeghiayan was not convinced the attorney knew his clients "were going to commit perjury," noting that "although guilty of some misconduct at trial, [plaintiffs' counsel] cannot be held accountable for the perjury committed by Plaintiffs."

This appeal is from the district court's final order dismissing the plaintiffs' federal and state claims with prejudice. The plaintiffs also seek review of the court's orders granting summary judgment in favor of the City and certain officers and granting the officers' mid-trial Rule 50(a) motion for judgment as a matter of law.

## II. Discussion

The plaintiffs argue that the extreme sanction of dismissal was unwarranted in this case because the instances

of perjury cited by the district court were merely ambiguities or innocent discrepancies in certain aspects of their testimony. They also argue the sanction unjustly punished Yesenia Mendez and David Mendez, neither of whom were accused of perjury in the officers' motion for sanctions. As to the two orders entered by Judge O'Meara in 2001, the plaintiffs claim the court erred in (1) granting summary judgment in favor of the City and certain officers on some of the claims; and (2) entering Rule 50(a) judgment as a matter of law in favor of certain officers on the claims that went to trial. The plaintiffs seek a remand for a new trial before a different district judge.

The officers defend the entry of summary judgment, but as to the claims that went to trial, now concede they were not entitled to a Rule 50(a) judgment on all but two. They maintain, however, that the entry of the Rule 50(a) judgment was harmless error because Judge Der-Yeghiayan would likely have dismissed those claims as a sanction for perjury. The officers' theory assumes the propriety of the sanction order, which they also defend on appeal, so we will address that matter first.

### A.  Dismissal Sanction

A district court has inherent authority to sanction conduct that abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003). The sanction imposed should be proportionate to the gravity of the offense. *Allen v. Chi. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003). Though "particularly severe," the sanction of dismissal is within the court's discretion. *Chambers*, 501 U.S. at 45.

Our review is deferential. *See Divane v. Krull Elec. Co.*, 200 F.3d 1020, 1025 (7th Cir. 1999) (noting the trial court's "intimate familiarity" with the relevant proceedings). The imposition of a dismissal sanction is reviewed for abuse of discretion, and underlying factual findings are reviewed for clear error. *See Dotson*, 321 F.3d at 666-*67*.

The plaintiffs suggest we review Judge Der-Yeghiayan's sanction order de novo. They argue that deference to Judge Der-Yeghiayan's findings and conclusions is inappropriate given that the sanctionable conduct alleged by the officers occurred in 2001 while the case was before Judge O'Meara. We need not address this subset of the plaintiffs' argument, however; the dismissal sanction was improper even under the more deferential abuse-of-discretion and clear-error standards.

As a fraud on the court, perjury may warrant the sanction of dismissal. *Allen*, 317 F.3d at 703. We say "may" because "one can imagine [perjury] cases in which a sanction of dismissal would be excessive." *Id.* Putting aside for a moment the question of whether the sanction here was proportionate to the gravity of the offense, we are confronted with the more immediate question of whether the testimony that formed the basis of the district court's sanction order amounted to perjury in the first place. In the federal criminal context, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (summarizing the elements of 18 U.S.C. § 1621); *see also United States v. Dumeisi*, 424 F.3d 566, 582 (7th Cir. 2005). After carefully reviewing the district court's order and the relevant portions of the record, we cannot agree that the conduct cited by the district court satisfies this definition.

The first flaw in the district judge's reasoning is that he failed to apply or even identify *any* legal definition of perjury. The second is that he misinterpreted the inconsistencies in the plaintiffs' deposition and trial testimony—inconsistencies of the sort that provide fertile ground for vigorous impeachment but do not support perjury findings—as a conspiracy among the plaintiffs to fabricate testimony.

The plaintiffs did not admit giving false testimony, and the court did not mention any direct evidence that plaintiffs knowingly lied under oath (there is none, as far as we are aware). Instead, the court simply identified six specific discrepancies between testimony given by certain of the plaintiffs in deposition and the testimony they gave at trial. We assume the court inferred from these discrepancies that the plaintiffs intentionally lied at either their depositions or at trial. The transcripts, however, provide virtually no support for this inference. True, the plaintiffs' version of events at trial in 2001 were in certain respects out of sync with the story they told in their 1999 depositions, but no evidence suggests these inconsistences were willful, material falsehoods.

The first discrepancy cited by the court involved plaintiff Ricardo Ruiz's trial testimony that he saw arriving police officers beat plaintiff Esteban Montaño after an initial altercation between Montaño and other officers beside a squad car. At his deposition Ruiz testified he did not think he saw officers doing anything to Montaño "after more police officers arrived." These two statements are not necessarily facially inconsistent—both might be understood to imply that the alleged beating of Montaño was over by the time the last backup officer arrived. Moreover, there is simply no evidence to sup-

port the conclusion that Ruiz lied about having seen officers beat Montaño or suggesting that the altercation never took place.[2] *Cf. Allen*, 317 F.3d at 702 (plaintiff who *admitted* lying at his deposition committed perjury). That Ruiz gave somewhat incongruous accounts of the sequence, duration, and scope of the altercation is hardly unusual; inconsistences of this sort are the prototypical products of "confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94; *see United States v. Griffin*, 310 F.3d 1017, 1024 (7th Cir. 2002); *United States v. Payne*, 102 F.3d 289, 292 (7th Cir. 1996). These inconsistencies certainly bear on Ruiz's credibility—the officers introduced his deposition testimony as impeachment evidence—but in the absence of other evidence of a deliberate falsehood do not permit the inference that Ruiz committed perjury.

The same holds true for the remaining testimonial inconsistencies cited by the district court. Montaño testified at trial that Officer Atilano hit him in the face or head with a flashlight, yet stated in his deposition that Officer Atilano tried but failed to hit him in the face after striking him in the back. This is the sort of discrepancy that juries routinely sort out; by itself, it does not support a conclusion that Montaño committed perjury. Indeed, Montaño had an innocent explanation for that discrepancy; he chalked it up to faulty memory, testifying that it was only after his deposition that he

---

[2] Counsel for the plaintiffs told us at oral argument that the bystander's videotape that recorded part of the incident briefly shows officers hitting Montaño, and the record also contains color photographs of Montaño's injuries taken after the September 14, 1997 incident.

remembered being struck in the face by Officer Atilano. Montaño's faulty-memory claim hinges on his credibility—the province of the jury, not the court.

On direct examination Montaño also denied punching a police officer—an accusation he later admitted on cross-examination. Here again, there is no direct evidence that Montaño knowingly lied when he initially denied punching the officer. On direct examination, moments after he denied throwing a punch, Montaño admitted that "one of my hands got [sic] contact with one of the officers in front of me." He later conceded on cross-examination, after being shown the videotape of the incident, that it was actually a punch. This sequence of testimony may tarnish Montaño's credibility before the jury, but standing alone is insufficient to support a perjury finding.

The two testimonial discrepancies attributable to plaintiff Julio Perales also fall short of perjury. The first involves an apparent conflict between his trial testimony in which he stated that he saw officers "stomp" on plaintiff Ricardo Ruiz and his deposition testimony in which he responded "No" to the question: "Other than [Ruiz being pushed to the ground and placed in handcuffs], did you see anything else done to [Ruiz]?" Perales never affirmatively denied in his deposition that officers "stomped" on Ruiz; there may or may not be an explanation for his failure to mention that part of the incident at his deposition. But even if unexplained, this discrepancy, like the others cited by the district court, is standard-fare impeachment evidence; it is not, without more, proof of perjury.

The second discrepancy involves Perales's trial testimony that he was strip-searched at the police station. Confronted on cross-examination with a portion of his

deposition testimony in which he denied being strip-searched, Perales claimed he did not recall the search until the day after the deposition. Although Perales's explanation strikes us as implausible, or at least more convenient than persuasive, there is no other evidence to suggest a deliberate falsehood. The discrepancy alone is not enough to support a perjury finding.

The final testimonial discrepancy cited by the district court concerns David Mendez's trial testimony about the sequence of events at the jail after the plaintiffs were arrested. Montaño claimed he was subjected to a further beating at the jail. Mendez testified at trial that he did not look at Montaño when officers returned him to the lockup. At his deposition, however, he stated that "at some point" he *did* look at Montaño but did not notice anything different about him. David Mendez attributed that inconsistency to confusion, explaining that he interpreted "at some point" to mean "some time later." In the district court, the officers characterized this discrepancy as further evidence of litigation "misconduct" by the plaintiffs; the district judge found it was perjury. We cannot agree. This sort of testimonial inconsistency about whether and when Mendez saw a difference in Montaño's injuries is routine impeachment evidence; it does not, by itself, support a finding that Mendez committed perjury.

There is a marked difference between a witness who knowingly lies about a material matter and a witness who is impeached with a prior inconsistent account of a sudden and chaotic event that happened years ago. The former is almost always perjury; the latter may be the product of confusion, mistake, or faulty memory. *See Griffin*, 310 F.3d at 1024; *Payne*, 102 F.3d at 292. Inconsis-

tent testimony *may* amount to perjury if the plaintiffs' intent was to give false testimony on a material matter, but the inconsistencies here do not themselves support an inference of intent to testify falsely. There is no other evidence to support a finding that these plaintiffs deliberately fabricated their testimony. The district court seized on the fact that Montaño, Ruiz, Perales, and David Mendez "met and discussed the events of September 14, 1997 on more than ten occasions prior to the trial." But when Ruiz was asked at trial whether the purpose of those meetings was "to get your story straight about what happened," he denied it, setting up a routine credibility question for the jury. The district court cited no other evidence to support its conclusion that the foregoing inconsistent passages of testimony constituted perjury; our own review of the record has disclosed none. The district court's perjury findings were clearly erroneous, and therefore its dismissal sanction was an abuse of discretion.

We note as an aside that even had the record shown clear evidence of perjury by Montaño, Ruiz, Perales, and David Mendez, the extreme sanction of dismissal would be disproportionately severe as to Yesenia Mendez, against whom no accusations of perjury were ever leveled. *See Allen*, 317 F.3d at 703 (sanction should be "proportion[ate] to the gravity of the offense"). Dismissing her case for the actions of the other four plaintiffs was an abuse of discretion.[3] In addition, large

---

[3] The district court also cited misconduct by the plaintiffs' attorney—who repeatedly disobeyed a pretrial evidentiary order forbidding mention of the video before it was admitted

(continued...)

portions of the other four plaintiffs' trial testimony did *not* contradict their deposition testimony. A jury could reasonably conclude their testimony was a mix of fact and fiction. *See id*. ("It simply is not a reasonable inference from a falsehood in one part of a witness's testimony to the falseness of the entire testimony."). Where a witness's testimony is "a compound of truth and falsity," the prudent course is to permit the jury to sort through it; "[p]erjury is a circumstance to be weighed by the jury in determining a witness's credibility rather than a ground for removing the issue of credibility from the jury by treating the witness's entire testimony as unworthy of belief." *Id.* By dismissing the case with prejudice, however, the district judge took the credibility question from the jury—and he did so on the basis of a paper record from a trial that was (as we will discuss in a moment) impermissibly cut short. The district court's sanction of dismissal with prejudice cannot stand.

## B. Rule 50(a) Judgment

The plaintiffs also claim the district court erred in granting judgment as a matter of law in favor of six of

---

[3] (...continued)
at trial—as another reason why the plaintiffs' claims should be dismissed, although the court apparently considered this a minor infraction compared to the plaintiffs' perjury (it refused to assess fees and costs under 28 U.S.C. § 1927). Having found insufficient evidence to support the district court's perjury findings, we are unwilling to affirm the sanction of dismissal based solely on the attorney's misconduct. In this as in other contexts, the punishment must fit the crime, *Bolt v. Loy*, 227 F.3d 854, 856 (7th Cir. 2000); outright dismissal with prejudice for this sort of attorney misconduct is excessive.

the officers at the close of the plaintiffs' case-in-chief.[4]
Rule 50 authorizes the entry of judgment as a matter of
law if "there is no legally sufficient evidentiary basis for
a reasonable jury to find for that party on that issue." FED.
R. CIV. P. 50(a)(1) (2001). The officers now concede that
with the exception of two claims, the Rule 50(a) judg-
ment must be reversed. In this context, because "we
'review judgments, not opinions,'" a defendant's "conces-
sion that the district court erred by granting him judg-
ment [under Rule 50] . . . is enough to require reversal of
the Rule 50 judgment and remand for a new trial." *See
Acevedo v. Canterbury*, 457 F.3d 721, 723 (7th Cir. 2006)
(citation omitted).

More specifically, the officers concede that the plain-
tiffs presented sufficient evidence that, if believed, would
permit a reasonable jury to find in their favor on the
following claims: Montaño's false-arrest claim against
Officers Atilano and LaFrancis; Montaño's excessive-
force claims against Officers Atilano and Toolis; the
excessive-force claims of Ruiz and David Mendez
against Officer Lopez; the excessive-force claims of
Montaño, Ruiz, and David Mendez against Officer

---

[4] The court's written Rule 50 order, dated November 19, 2001,
only names five officers (LaFrancis, Atilano, Toolis, Ferrer,
and Maduzia), but it is clear from the court's oral statements
that Rule 50 judgment was also granted in favor of Officer
Lopez on David Mendez's and Ruiz's excessive-force claims.
We suspect the reason Lopez's name is omitted from the
November 19 order was because *Montaño*'s excessive-force
claim against Lopez survived the Rule 50 order (later to be
dismissed as a sanction for perjury), and thus Lopez, unlike
the other five officers, was only awarded partial judgment as
a matter of law under Rule 50.

Ferrer; and the strip-search claims of Montaño, Ruiz, and Perales against Officer Maduzia. We accept the concession and agree that the Rule 50(a) judgment entered on these claims must be reversed.

The exceptions are these: Montaño's excessive-force claim against Officer LaFrancis based on an alleged episode of hair-pulling and David Mendez's strip-search claim against Officer Maduzia. As to the latter, David Mendez conceded he was not subjected to a strip search. As to the former, the plaintiffs did not cite to record evidence or otherwise develop their argument on appeal that judgment as a matter of law on this claim was improper. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) (We need not "scour the record" for evidence to support a party's argument on appeal; perfunctory or underdeveloped arguments are waived.). Accordingly, we affirm the Rule 50(a) judgment on these two claims.

### C.  Summary Judgment

Finally, the plaintiffs claim the district court erred in granting summary judgment for the City on the *Monell* claim and in favor of seven officers on certain false-arrest and failure-to-intervene claims. We review de novo a grant of summary judgment, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003), which is appropriate where the pleadings, depositions, and other documentary evidence show "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Because the City and the officers were the moving parties, we construe the evidence and any reasonable inferences in favor of the plaintiffs. *Pauley*, 337 F.3d at 770.

### 1. *Claims Against Individual Officers*

Ruiz, Perales, and David Mendez claimed Officers Atilano and LaFrancis lacked probable cause to arrest them on suspicion of drinking alcohol in a public way, a local ordinance violation. CHICAGO, ILL., CODE § 8-4-030 (1999). Because the existence of probable cause is an absolute defense to a § 1983 false-arrest claim, *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006), summary judgment is proper if the record establishes that "at the moment the arrest was made[,] . . . the facts and circumstances within [the officers'] knowledge . . . were sufficient to warrant a prudent [person] in believing" Ruiz and Mendez committed the offense of drinking in a public way. *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (defining probable cause). The undisputed evidence establishes that the two officers had probable cause to believe Ruiz, Perales, and Mendez were drinking in the public way.[5]

Ruiz admitted he was holding a bottle of beer in the vicinity of 25th and Whipple when Officers Atilano and LaFrancis slowly drove west past the intersection. Mendez also admitted he was holding a bottle of beer when the two officers turned around and made a second slow pass of the intersection (this time with their flashlights on), and that the intersection and a nearby stoop were strewn with empty beer bottles. An eyewitness also testified that she saw Ruiz, Mendez, and Perales standing in the street with beer bottles. All this corrobo-

---

[5] Perales also claims three other officers arrested him for disorderly conduct without probable cause. Because we find that Officers Atilano and LaFrancis had probable cause to believe Perales was drinking in the public way, however, we need not separately address this claim.

rates Officer LaFrancis's statement that when she and Officer Atilano got out of the squad car (immediately after making the second pass), they approached a noisy, apparently intoxicated group of celebrants at the corner of 25th and Whipple. While many in the group fled upon the approach of the police, five men who remained were ordered to put down their beer bottles and place their hands on the squad car. Ruiz and Perales were among those five, and Mendez was arrested nearby a short time later. Officer Atilano also said all three men were arrested after being seen holding a beer in the public way, although he did not see Montaño holding a beer.

Most important for summary-judgment purposes, none of these plaintiffs deny holding a beer in view of at least two officers. The undisputed evidence easily establishes probable cause to arrest Ruiz, Mendez, and Perales for drinking in a public way. Summary judgment on these claims was properly granted.

Yesenia Mendez also brought a false-arrest claim against Officers Zalewski and Predis. She claimed the two officers lacked probable cause to arrest her for disorderly conduct, but her claim is deficient in two respects. First, the uncontradicted evidence shows that Officer Predis—Officer Zalewski's partner—did not participate in the arrest; he was working crowd control and first had contact with Mendez when he helped Zalewski transport her to the squad car *after* her arrest. Second, the uncontradicted evidence also establishes that (1) a crowd had gathered after the initial altercation at the squad car; (2) Yesenia Mendez repeatedly complained to (and in one instance yelled at) Zalewski about the treatment of her husband (David Mendez) and

brother (Montaño); (3) Zalewski unsuccessfully ordered Mendez to leave the scene despite threats of arrest; and (4) Zalewski believed Mendez was aggravating an already chaotic and hazardous situation. At the very least, this is enough to confer qualified immunity, a defense Zalewski successfully pursued on summary judgment. *See Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

Officers Kusar and Matual were also entitled to summary judgment on the plaintiffs' failure-to-intervene claims. More specifically, the plaintiffs alleged (1) Officer Kusar failed to stop Officer Toolis from choking Montaño with a flashlight; and (2) Officer Matual failed to stop Officer Ferrer from driving the police van in such an erratic manner as to injure the plaintiffs. While an officer has a duty under § 1983 "to intervene to prevent a false arrest or the use of excessive force if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it," *Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003), the plaintiffs have not produced sufficient evidence that either officer "had reason to know . . . excessive force was being used . . . *and* . . . had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

As to Officer Kusar, none of the evidence cited by the plaintiffs—namely, Montaño's deposition and the officers' statement of undisputed facts—mention that Kusar was even involved in Montaño's arrest. While the officers concede that Kusar may have aided in the arrest, they deny he did anything improper, and under Rule 56.1 of the *Local General Rules of the U.S. District Court for the Northern District of Illinois*, the plaintiffs' "mere disagree-

ment with the movant's asserted facts is inadequate [to defeat summary judgment] if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *see also Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) ("On summary judgment . . . the plaintiff can no longer rest on the pleadings . . . ."). The scant record materials referenced in the plaintiffs' pleadings do not mention Kusar. As such, they were not enough to avert summary judgment.

As to Officer Matual, the evidence establishes only that he was a passenger in the police van driven by Officer Ferrer. The plaintiffs have cited no evidence that Matual knew Ferrer was intentionally injuring the plaintiffs in the back of the van or that he had a realistic opportunity to prevent the alleged harm. *Yang*, 37 F.3d at 285. That Matual was a passenger in the van does not by itself permit the inference that he "was informed of the facts that establish a constitutional violation and had the ability to prevent it." *Morfin*, 349 F.3d at 1001. Summary judgment on this claim was therefore properly granted.

### 2. The Monell Claim Against the City

While a municipality is not vicariously liable under § 1983 for the acts of its employees, a constitutional deprivation may be attributable to a municipality "when execution of a government's policy or custom . . . inflicts the injury." *Monell*, 436 U.S. at 694; *Schlessinger v. Salimes*, 100 F.3d 519, 522 (7th Cir. 1996). "In other words, to maintain a [*Monell*] claim against a municipality, one must establish the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom was the "moving

force" behind the constitutional deprivation)." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002); *see Bd. of the Co. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) ("The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."). The plaintiffs have produced insufficient evidence of any actionable policy on the part of the City of Chicago or its police department, as well as insufficient evidence that the City was deliberately indifferent to any widespread constitutional violations by its officers.

To establish a municipal policy for § 1983 purposes, plaintiffs must show either (1) an express policy that, when enforced, causes a constitutional deprivation; or (2) that the constitutional injury was caused by a person with final policymaking authority. *Gable*, 296 F.3d at 537. The plaintiffs claim the City had an express policy of condoning excessive force. For support they cite a decision of the Chicago Police Board that overturned the suspension of an officer who used a flashlight to strike a suspect who died shortly thereafter. In that decision the Police Board concluded the force the officer used was not excessive because (1) the suspect may have attacked the officer with a board; (2) the officer feared for his safety; (3) the suspect died from a cardiac arrhythmia caused by Thorazine and the strain of resisting arrest; and (4) the officer did not injure the suspect's brain or skull. In other words, the Board concluded that the force used in that specific case was justified. This hardly establishes a general policy of condoning the use of excessive force.

The plaintiffs also argue that City policymakers were deliberately indifferent to the need for an "early warning" system to preemptively remove "problem officers" from

the street. To establish municipal "custom" for § 1983 purposes, the plaintiff must show "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Gable*, 296 F.3d at 537. Because a municipality is only liable for deliberate conduct, the plaintiffs must also show that City policymakers were "deliberate[ly] indifferen[t] as to [the custom's] known or obvious consequences." *Brown*, 520 U.S. at 407 (quotation marks omitted). "Deliberate indifference" is a "stringent standard of fault." *Id.* at 410; *see also Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) (stating that a finding of deliberate indifference requires a showing that policymakers "were aware of a substantial risk" of a constitutional violation and "failed to take appropriate steps to protect [plaintiffs] from a known danger").

The plaintiffs' evidence of deliberate indifference to "problem officers" is limited to Officer Lopez; this cannot establish a "widespread practice that . . . is so permanent and well settled as to constitute a custom or usage." *Gable*, 296 F.3d at 537. The plaintiffs also point to portions of a 1994-1995 Police Board report noting that multiple appeals by officers accused of excessive force unnecessarily prolonged the disposition of internal disciplinary proceedings. Rather than establishing deliberate indifference, this report reflects the Board's deliberate attempt to *improve* (or at least identify) problems in the police department's system of adjudicating excessive-force claims. In short, the plaintiffs presented insufficient evidence of deliberate indifference to avoid summary judgment on this claim.

### III. Conclusion

For the foregoing reasons, we REVERSE the district court's dismissal of the plaintiffs' claims as a sanction; those claims are reinstated and REMANDED to the district court for further proceedings consistent with this opinion. We REVERSE IN PART the district court's order granting Rule 50(a) judgment as a matter of law in favor of certain officers, but AFFIRM IN PART with respect to David Mendez's strip-search claim against Officer Maduzia and Montaño's excessive-force claim against Officer LaFrancis. We AFFIRM the district court's order granting summary judgment in favor of the City and certain officers. Circuit Rule 36 shall apply upon remand.