In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-1941

CASEY GABLE, GREG MOORE, LOIS KALAGA,
ALAN KALAGA, and ADALBERTO MONTANEZ,
on behalf of themselves and all others
similarly situated,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, a municipal corporation,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 4872—**Ronald A. Guzman**, *Judge.*

ARGUED JANUARY 11, 2002—DECIDED JULY 8, 2002

Before EASTERBROOK, KANNE, and DIANE P. WOOD,
*Circuit Judges.*

KANNE, *Circuit Judge.* The plaintiffs are all people whose
vehicles were towed to, and subsequently damaged or de-
stroyed at, an impoundment lot located at 701 N. Sacra-
mento Avenue in Chicago ("Lot 6") between July 1995 and
May 1999. The plaintiffs brought a class action lawsuit pur-
suant to 42 U.S.C. § 1983, alleging that the City of Chicago
deprived them of due process of law and was liable for
these incidents of damage and destruction. The district

court granted summary judgment in favor of the City, and we affirm.

## I. Background

### A. *The City's Towing and Impoundment Policies*

The City of Chicago Municipal Code (the "Code") authorizes the City to tow and impound motor vehicles in various enumerated circumstances. Lot 6—the only impoundment lot about which the plaintiffs complain—is one of the City-owned impoundment lots. Between 1995 and 1999, a total of 181,911 vehicles were impounded at Lot 6, which covers five square blocks and has only one entrance. Otherwise, the lot is relatively inaccessible due to high chain-link fences and railroad track berms that surround its borders. The City's Department of Streets & Sanitation was responsible for the operation and management of Lot 6 until August 1997, when a private company named Environmental Auto Removal, Inc. ("EAR") was contracted to operate and manage the lot throughout the remainder of the class action period.

The City's policies relating to the towing and impoundment of vehicles are stated in the Code and in a procedural manual created by EAR in 1997. When a vehicle is towed to Lot 6, pound personnel[1] conduct a physical examination of the vehicle and complete a Motor Vehicle Inventory Report. The Inventory Report describes the condition of the vehicle, describes the specific location of the vehicle in the lot, identifies when the vehicle was redeemed and by

---

[1] This term or "pound employee" is used throughout this opinion to refer to the City agents that took the actions about which the plaintiffs complain. Before August 1997, the pound personnel were employees of the Department of Streets & Sanitation, and afterwards, they were employees of EAR.

whom, and if the vehicle was never redeemed, describes the manner and date in which the vehicle was disposed. Pound personnel then enter this information into a daily log book and into a computer system known as the "Hot Desk System," which allows the City to track the location and disposition of all towed vehicles in the City and to respond to inquiries by vehicle owners about the location of their vehicles. For example, the Hot Desk System allows any City pound and several City departments (such as the Police Department and Department of Streets & Sanitation) to determine whether a vehicle is located at Lot 6 by entering the vehicle's license plate number or VIN number into the system.

After a vehicle is towed to Lot 6, pound personnel also access the Secretary of State's database in order to identify the registered owner of the vehicle. Upon obtaining this information, the City has ten days to send a Notice of Impoundment ("Notice Form") to the vehicle owner. The Notice Form describes the vehicle, states when it was towed and the reason for the tow, and identifies the lot in which the vehicle is being impounded. The Notice Form also describes the procedures that allow the vehicle owners to retrieve their vehicles after paying the applicable charges or to obtain a hearing to challenge the impoundment. Finally, the Notice Form states that the vehicle will be disposed of if not retrieved by a certain date.[2]

When a vehicle owner picks up his vehicle from Lot 6, he has the opportunity to request that pound personnel fill out a claim form, allowing the owner to document any alleged damage or theft that occurred while the vehicle was impounded. The pound employee who completes the claim

---

[2] The City disposes of unclaimed vehicles by compacting them and selling them for scrap, by selling the vehicles at an auction, or by retaining the vehicles for City use.

form is required to verify that the alleged damage accurately reflects the condition of the vehicle and that any property allegedly stolen is not inside of the vehicle.

## B. The Plaintiffs' Claims

The plaintiffs filed a one-count complaint in the district court, alleging that the City deprived them, and others similarly situated, of due process of law for four reasons. First, the plaintiffs claimed that the City failed to timely notify vehicle owners that their vehicles had been towed to Lot 6. Specifically, of the 181,911 vehicles that were towed to Lot 6 during the class action period, there were four instances where the vehicle owners did not receive a Notice Form. For example, plaintiffs Casey Gable, Greg Moore, and Brian Johnson were mailed Notice Forms within the required ten-day period to the most recent addresses that each had reported to the Secretary of State. However, none of these plaintiffs received the Notice Forms because the addresses to which the Notice Forms were sent were not the addresses at which any of them still lived—before their vehicles were towed, all three had moved without reporting their address changes to the Secretary of State. Further, although the record is unclear as to the reason, plaintiff Melinda Dimond also did not receive a Notice Form, but subsequently learned that her vehicle had been towed to Lot 6 and retrieved it from the lot four days after it was towed.

Second, the plaintiffs alleged that the City denied to vehicle owners that their vehicles were present at Lot 6 even though it knew or should have known that the vehicles were in fact present there. The record reveals that there were three instances in which this occurred—with respect to plaintiffs Gable, Gene Floriani, and Moore. For example, Gable or her boyfriend called Lot 6 every day for seven days inquiring about whether her vehicle was being impounded

there. Pound personnel repeatedly told her that her vehicle
was not there. Two weeks after Gable's vehicle was towed,
a friend of Gable's who worked in another impoundment
lot called Lot 6, and pound personnel told Gable's friend
that Gable's vehicle was in fact located at Lot 6 and had
been since the day it was towed. Upon learning this, Gable
immediately went to the pound and retrieved her vehicle,
which had incurred extensive damage while being im-
pounded.

After Floriani's vehicle was towed to Lot 6, he contacted
the lot, but pound personnel told him that his vehicle was
not there. Two or three days later, Floriani received a call
from the Chicago Police Department, informing him that
his vehicle was at Lot 6. However, when Floriani arrived at
Lot 6, he discovered that it had been damaged to such an
extent that he decided to leave it there.

When Moore's vehicle was towed from a friend's driveway,
the person towing it told the friend that it was being towed
to Lot 6. Thus, five days later, Moore went to a Chicago
Police Department precinct, and a police officer entered
Moore's license plate and VIN numbers into the Hot Desk
System, but the system incorrectly indicated that Moore's
vehicle had not been towed. Moore went to Lot 6 later that
day, and pound personnel again told him that his vehicle
was not being impounded there. For the next several weeks,
Moore made inquiries to pound personnel about the where-
abouts of his vehicle, and the personnel repeatedly told
him that it was not located at Lot 6. Finally, Moore re-
turned to Lot 6 a few weeks after his vehicle had been
towed, and a pound employee told Moore that it had been
present there but had been disposed of a few days earlier.

Third, the plaintiffs alleged that the City, through its
agents, systematically broke into and entered vehicles
towed to Lot 6, and stole property from these vehicles.
During the class period, there were approximately 1,400

damage and theft claims filed with respect to vehicles towed to Lot 6. It is undisputed that many of the vehicles were accidentally damaged while initially being hoisted by the tow truck or while being transported to Lot 6. With respect to the incidents of intentional damage to the vehicles or theft therefrom, since 1995, there have been only two incidents where pound employees were caught causing damage to or stealing from vehicles impounded at Lot 6, and these employees were immediately fired. On the other hand, there is ample evidence that third parties are mainly responsible for the intentional incidents of damage and theft that have occurred at Lot 6. The record shows that police officers patrolling Lot 6 or pound personnel have often caught third parties stealing from or damaging impounded vehicles. Furthermore, incident reports prepared by EAR reflect that pound personnel have discovered several holes cut in the chain-link fence surrounding Lot 6 and have seen third parties enter the lot through these holes.

In any event, the City has made efforts to reduce the number of damage and theft claims occurring at Lot 6, whether perpetrated by pound employees or by third parties. For example, since at least 1995, police officers are required to conduct routine surveillance of Lot 6 and the area immediately surrounding it. Further, pound employees are required to check the fencing around Lot 6 every morning and must repair any damage they observe to the fence. Perhaps the most significant step the City took to minimize the incidents of damage and theft was to hire EAR to operate and manage Lot 6. Indeed, the City included a clause in EAR's contract that required EAR to "take all necessary precautions to avoid any damage or injury to persons or property, including without limitation City property, any towed Vehicle and any personal property in the Vehicle." Pursuant to the policies in EAR's employee handbook, pound personnel are subject to periodic, random inspections of their vehicles to ensure that they are not removing any

stolen property from Lot 6, and EAR policy specifically
states that any pound employee caught stealing from the
impounded vehicles will be fired immediately. Pound
personnel also inspect every tow truck that enters and exits
Lot 6 in order to ensure that no property is being unlaw-
fully removed. In addition, in order to deter trespassers,
EAR erected a dog run around Lot 6's perimeter in which
eight guard dogs roam freely. EAR also requires a guard
and dog team to roam the inside of Lot 6 at all times.
Although it is undisputed that incidents of damage and
theft continue to occur, the number of claims filed has
decreased steadily each year since EAR began managing
Lot 6 in 1997.

Finally, the plaintiffs claimed that the City, through its
agents, systematically compacted and destroyed vehicles
that were towed to Lot 6 without notice to the owners, often
in an attempt to cover up the theft and vandalism done to
the vehicles. The record reveals that the City disposed of
four plaintiffs' vehicles that had been impounded at Lot 6
during the class action period. In all four of these instances,
the vehicles were not disposed of until after expiration of
the time period within which the vehicle owners could re-
trieve their vehicles from Lot 6.

The plaintiffs moved for summary judgment, and the City
filed a cross-motion. The district court granted summary
judgment in favor of the City, and the plaintiffs now appeal.

## II. Analysis

We review a grant of summary judgment *de novo*, viewing
all of the facts, and drawing all reasonable inferences there-
from, in favor of the nonmoving party. *See Cent. States,
Southeast and Southwest Areas Pension Fund v. White*, 258
F.3d 636, 639 (7th Cir. 2001). Summary judgment should
be granted if the "pleadings, depositions, answers to inter-
rogatories, and admissions on file, together with the affi-

davits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 450 (7th Cir. 1998) (quoting FED. R. CIV. P. 56(c)).

## *A. Municipal Liability*

The plaintiffs argue that the City violated their procedural and substantive due process rights through the following actions: 1) failing to notify the plaintiffs that their vehicles had been towed to Lot 6; 2) denying to the plaintiffs that their vehicles were impounded at Lot 6, when in fact they were; 3) damaging the plaintiffs' vehicles and stealing items therefrom and continuing to allow incidents of damage and theft to occur at Lot 6; and 4) unlawfully disposing of the plaintiffs' vehicles. The plaintiffs contend that these actions deprived them of two property interests—the use of their vehicles during the time in which the City incorrectly told them that their vehicles were not at Lot 6 and the damage that their vehicles incurred.

It is well settled that the City cannot be liable for the above actions through a theory of *respondeat superior. See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. In other words, to maintain a § 1983 claim against a municipality, one must establish the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom was the "moving force" behind the constitutional deprivation). *Id.* at 691-94.

The plaintiffs can establish a "policy or custom" by showing: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994) (citations and quotations omitted). The plaintiffs concede that their injuries did not result from the application of an express policy or from any particular act of an individual with policymaking authority. Rather, the plaintiffs claim that the actions of which they complain were "so permanent and well settled" that they constituted City customs.

In order for the plaintiffs to show that the alleged customs were attributable to the City and thus had the force of law, they must show that City policymakers were "deliberately indifferent as to [their] known or obvious consequences." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 406-07, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (quotations omitted).[3] The Supreme Court has defined deliberate indifference in this context to mean that "a reasonable policymaker [would] conclude that the plainly obvious consequences" of the City's actions would result in the deprivation of a federally protected right. *Id.* at 411; *see also Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) (stating that a finding of deliberate indifference requires a showing that policymakers "were aware of a substantial risk" of a constitutional violation and "failed to take appropriate steps to protect [plaintiffs] from a known danger").

---

[3] Municipal customs also have the force of law if the customs are themselves unconstitutional. *See id.* However, in this case, the plaintiffs proceed solely via the deliberate indifference route.

*B. Culpability: Was the City Deliberately Indifferent?*

As a preliminary matter, the plaintiffs have waived two of their arguments on appeal by not developing them in their opening brief—that the City had customs of failing to notify people that their vehicles were at Lot 6 and of disposing of vehicles without notice. *See Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190, 1192 (7th Cir. 1999) (holding that argument that was "so little developed in plaintiff's opening brief in this court" was waived).

We turn, therefore, to whether the plaintiffs can establish the requisite culpability to link the City to the other actions about which they complain. First, they contend that the City had a custom of erroneously denying to vehicle owners that their vehicles were at Lot 6. In support of this argument, the plaintiffs adduced evidence that this occurred on only three occasions during the four-year class period—with respect to class members Gable, Floriani, and Moore.[4] The district court found, and we agree, that these three incidents were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware. *See Denno v. School Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1277 (11th Cir. 2000) ("[N]ormally random acts or isolated incidents are insufficient to establish a custom."). In *Denno*, the plaintiff brought suit on behalf of her son who had been suspended for displaying a Confederate flag at school, alleging that the School Board had a custom of prohibiting Confederate flags in violation of the First

---

[4] The record shows that pound personnel used the Hot Desk System to attempt to locate these plaintiffs' vehicles. The record does not reveal, however, why the Hot Desk System failed to locate the vehicles in those instances, although a pound employee testified that it was possible that incorrect information was entered into the system.

Amendment. *See id.* at 1269, 1277. Although the plaintiff had adduced evidence of three other students who had been suspended for displaying Confederate flags, the court held that these incidents "did not represent a persistent and widespread practice." *Id.* at 1277. Likewise, in our case, we have no problem concluding that of the 181,911 vehicles that were towed to Lot 6, the three incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a "persistent and widespread practice." *Id.*

The plaintiffs next contend that the City, through its agents, systematically broke into and stole items from vehicles impounded at Lot 6 and continued to allow these incidents of damage and theft to occur despite numerous complaints. There were only two incidents of damage and theft that were perpetrated by pound employees.[5] These

---

[5] The distinction between whether third parties or pound employees damaged and stole from the vehicles at Lot 6 is important because "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). Thus, the Supreme Court has concluded that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. An exception to this general rule applies when certain "special relationships" between the State and the plaintiff exist, such as when the State has assumed custody of a prisoner. *See id.* at 197-99. Even assuming, *arguendo*, that the City had a duty to protect the plaintiffs' vehicles from third parties in this case, we would still affirm the district court's grant of summary judgment in the City's favor. As discussed below, the City implemented extensive and largely successful measures to protect the plaintiffs' vehicles, and Illinois law provides a fully adequate remedy. Both the measures taken by the City and the

(continued...)

incidents are too few to constitute a permanent and well settled custom. *See Denno*, 218 F.3d at 1277. Moreover, even if pound employees were responsible for many more of the incidents of damage and theft, as the plaintiffs suspect (but have not shown), the City was not deliberately indifferent to whether the problem would continue. First, EAR had an express policy that any employee caught damaging or stealing from a vehicle at Lot 6 would be fired immediately, and this policy was enforced against the two pound employees who were caught.

In addition, the City implemented extensive measures to prevent both third parties *and* pound personnel from damaging or stealing from vehicles at Lot 6, and these measures have been successful in decreasing the number of claims filed. For example, the City installed high fences around Lot 6's borders, and pound personnel repaired damage to the fences on a daily basis. Further, the City raised the height of the railroad berms that surrounded Lot 6. The City also hired EAR to operate and manage Lot 6, and in response, EAR implemented several security measures such as requiring pound personnel to inspect every tow truck that entered and exited Lot 6 and subjecting the employees to random inspections. Moreover, EAR installed a dog run and hired security guards and off-duty policemen to conduct 24-hour surveillance of Lot 6. The extent and nature of the specific measures taken by the City in this case support the conclusion that the City was not deliberately indifferent. *See Frake*, 210 F.3d at 782 (finding no deliberate indifference in part because City took "many precautions" to prevent constitutional deprivations, even though deprivations continued to occur).

_____

[5] (...continued)
adequate state remedy would shield the City from liability in this case even if a special relationship existed so that the City had a duty to protect the plaintiffs' vehicles from actions taken by third parties.

### C. Causation: Due Process Violations

The plaintiffs' § 1983 claim also fails because they cannot establish that the City's actions deprived them of either procedural or substantive due process. Thus, the plaintiffs cannot meet the causation requirement of showing that the City customs were the "moving force" behind a constitutional deprivation. *See Butera v. Cottey*, 285 F.3d 601, 609 (7th Cir. 2002).

### 1. Procedural Due Process

It is undisputed that the plaintiffs were deprived of two property interests—the use of their vehicles during the time in which pound personnel erroneously told them that their vehicles were not at Lot 6 and the damage that their vehicles incurred. However, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990). In *Parrett v. Taylor*, 451 U.S. 527, 541, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), the Supreme Court held that due process is not violated when a state employee negligently deprives an individual of property, provided that the state makes available a meaningful postdeprivation remedy. The rationale behind *Parrett* was that "when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). Accordingly, the Supreme Court has extended *Parrett*'s logic to apply to intentional deprivations of property. *See id.*

In *Hudson*, a state prisoner brought a § 1983 suit against a corrections officer, arguing that the officer had intention-

ally destroyed some of his property. *See id.* at 520. The Supreme Court affirmed the lower court's grant of summary judgment in favor of the defendant, stating that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause . . . if a meaningful postdeprivation hearing for the loss is available." *Id.* at 533. The Court found that the state cannot "anticipate and control in advance the random and unauthorized intentional conduct of its employees," and therefore, a predeprivation hearing would have been "impracticable." *Id.* The Supreme Court also found that the availability of a common-law tort suit against the corrections officer constituted an adequate postdeprivation remedy. *See id.* at 534-35. In so doing, the Court rejected the plaintiff's contention that a tort suit was not an adequate remedy because it would not "necessarily compensate him fully," and stated, "that [plaintiff] might not be able to recover under these [common-law tort] remedies the full amount which he might receive in a § 1983 action is not . . . determinative of the adequacy of the state remedies." *Id.* at 535.

*Parrett* and *Hudson* are directly applicable to the present case. As discussed above, the City was not deliberately indifferent towards the two acts about which the plaintiffs complain, and these acts certainly were not authorized. Further, it would not have been practicable for the City "to anticipate and control in advance" such random acts as erroneous denials that a vehicle was at Lot 6 or two incidents of damage or theft. *Id.* at 533. Thus, as in *Parrett* and *Hudson*, there was no due process violation so long as a meaningful postdeprivation remedy was available. We now turn to that question.

In this case, Illinois law would have provided the plaintiffs with an adequate postdeprivation remedy. A vehicle owner whose vehicle was damaged at Lot 6 could have obtained compensation from the City for the damage via an

action of bailment. *See*, *e.g.*, *Am. Ambassador Casualty Co. v. City of Chicago*, 563 N.E.2d 882, 884-85 (Ill. App. Ct. 1990). Such a bailment action would also have allowed a vehicle owner to obtain an equitable decree directing the return of property that was wrongfully withheld as well as damages for the period during which the property was wrongfully withheld. *See id.* Thus, a bailment action would also have provided a complete remedy for those owners who were erroneously told that their vehicles were not at Lot 6. It is also possible that these owners may have had a viable claim in an action for replevin. *See* 735 ILCS 5/19-101 (owner of "goods or chattels" may sue in replevin "for the recovery of such goods or chattels . . . ."); *see also Holstein v. City of Chicago*, 29 F.3d 1145, 1148 (7th Cir. 1994) (holding that Illinois replevin law provides due process for those seeking return of their vehicles). The plaintiffs argue that these tort actions were inadequate because they would not provide for attorneys' fees, as would a successful § 1983 action. However, as the Supreme Court has held, the fact that the plaintiffs might be able to recover more in a § 1983 action than in a tort action does not render the tort action an inadequate postdeprivation remedy. *See Hudson*, 486 U.S. at 535. Therefore, the plaintiffs were not deprived of procedural due process.

## 2. Substantive Due Process

In order to prevail on a substantive due process claim involving a deprivation of a property interest, a plaintiff must "show either the inadequacy of state law remedies or an independent constitutional violation." *Doherty v. City of Chicago*, 75 F.3d 318, 326 (7th Cir. 1996). The plaintiffs in this case can show neither, and thus, their substantive due process claim fails. As discussed above, the plaintiffs cannot show the inadequacy of state law remedies. Further, they fail to allege a constitutional violation other than violations

of due process, and thus have not shown that the City violated "some other substantive constitutional right." *Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997).

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

A true Copy:

       Teste:

 

               _____

               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*