In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 19-1926 & 19-1939

LYDIA E. VEGA,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

CHICAGO PARK DISTRICT,

*Defendant-Appellant/*
*Cross-Appellee.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-451 — **Jorge L. Alonso**, *Judge.*

ARGUED JANUARY 9, 2020 — DECIDED APRIL 7, 2020

Before WOOD, *Chief Judge*, and EASTERBROOK and BARRETT,
*Circuit Judges*.

BARRETT, *Circuit Judge*. Lydia Vega sued her former
employer, the Chicago Park District, alleging that the Park
District discriminated against her due to her national origin
in violation of Title VII and 42 U.S.C. § 1983. After a seven-

day jury trial, the jury returned a verdict in Vega's favor on both claims and awarded her $750,000 in compensatory damages. The Park District moved for judgment as a matter of law on both claims; the district court granted the motion with respect to the § 1983 claim but denied it with respect to the Title VII claim. With the § 1983 claim gone, the district court remitted Vega's award to $300,000, which is the statutory maximum under Title VII. It then conducted a bench trial on equitable remedies and granted Vega back pay, benefits, and a tax-component award.

On appeal, the Park District challenges the district court's denial of its motion for judgment as a matter of law on Vega's Title VII claim, several evidentiary rulings, the statutory maximum damages award, and the calculation of equitable remedies. Vega cross-appeals the district court's entry of judgment as a matter of law on her § 1983 claim. We affirm all of the district court's rulings except its grant of the tax-component award, which we vacate and remand for the district court to explain its calculation.

I.

Lydia Vega, a Hispanic woman, began her employment with the Chicago Park District in 1987 and was promoted to the position of park supervisor in 2004—a position that she retained until she was fired in 2012 for allegedly violating the Park District's employment Code of Conduct. We recount the story of the Park District's investigation and termination of Vega's employment in the light most favorable to her. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

In late September 2011, the Park District received an anonymous call, accusing Vega of "theft of time"—clocking in

hours that she had not worked. In response to this accusation, an investigator for the Park District began surveilling Vega's car. A few days later, another anonymous caller again accused Vega of theft of time. At that point, another investigator began a separate and simultaneous investigation of Vega. Over the course of 56 days, Vega was surveilled over 252 times. On numerous occasions, the investigators interrupted Vega at work in front of her coworkers to ask her questions as a part of the investigation.

In March 2012, the investigators met with Vega and her union representative. The investigators had no interest in hearing Vega's side of the story; instead, Vega and her union representative found them to be "pretty dead set" on their conclusion that Vega had violated the Park District's Code of Conduct. By this point, the investigative process was causing Vega significant anxiety, and in late March, she took medical leave on the advice of her physician.

Between July and August 2012, Vega received two separate Corrective Action Meeting notices accusing her of the slightly different offense of timesheet falsification—not being present at her assigned location at the assigned time. After sending each notice, Mary Saieva, the Park District's Human Resources Manager, met with Vega and her union representative. Saieva, like the investigators, had little use for Vega's side of the story. At both meetings, Saieva refused to listen to Vega's explanations or review the documents that Vega had brought with her to dispute the allegations. After the meetings, Saieva called Elizabeth Millan, Vega's former supervisor, to discuss the discrepancy in Vega's timesheets. Millan told Saieva that she might have asked Vega to work from home on at least one of those occasions, which would explain

one of the timesheet discrepancies. Saieva, however, disbelieved Millan, who, like Vega, was Hispanic.

Convinced that Vega was guilty, Saieva recommended that Vega's employment be terminated. In violation of the Park District's commitments under its union agreement, Saieva neither consulted with Vega's then-supervisor nor recommended any progressive discipline. Instead, she told Michael Simpkins, the Park District's Director of Human Resources, that Vega should be fired.

Simpkins fired Vega after receiving Saieva's recommendation and briefly reviewing the investigative report. According to the final termination letter, Vega was not fired for theft of time; rather, she was fired for eleven timesheet falsifications and for being untruthful during her Corrective Action Meetings. In another violation of its union commitments, the Park District did not offer Vega's union a pre-disciplinary agreement. Vega appealed the termination decision to the Park District Personnel Board. At that point, an administrative officer held a hearing and subsequently concluded that Vega's employment was properly terminated. The Personnel Board adopted that decision.

Vega sued the Park District under Title VII and 42 U.S.C. § 1983, alleging discrimination on the basis of national origin. (We will discuss the evidence that she presented at trial in greater detail below.) After the evidence was in, the Park District moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on all of Vega's claims, but the district court denied the motion. It sent the case to the jury, which returned a verdict for Vega on both her Title VII and § 1983 claims and awarded her $750,000 in compensatory

damages. As for Vega's retaliation claims, however, the jury found in favor of the Park District.

The Park District renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and moved for a new trial under Federal Rule of Civil Procedure 59. In a separate Rule 59 motion, the Park District also asked the court to remit the jury's compensatory award. The district court granted the Park District's Rule 50(b) motion on Vega's § 1983 claim but denied it with respect to her Title VII claim. In light of that disposition, the district court remitted the jury's compensatory award to $300,000, which is the statutory maximum under Title VII.

The district court then conducted a bench trial on equitable remedies. It awarded Vega back pay ($154,707.50 in salary and $1,200 in lost bonuses) and benefits ($9,255.42 in substitute health insurance premiums). It initially rejected Vega's request for a $30,531.27 tax-component award because it found that Vega had not adequately explained the calculation justifying that amount. But, after Vega submitted supplemental briefing on the issue, the district court awarded Vega a tax-component award of $55,924.90 without explaining how it reached that figure. Finally, as an equitable remedy, the district court ordered the Park District to reinstate Vega to her former position as a park supervisor.

The Park District appeals every ruling that it lost except for Vega's reinstatement. In her cross-appeal, Vega asks us to reverse the district court's judgment as a matter of law on her § 1983 claim and to restore the jury's $750,000 compensatory damages award.

A.

The Park District argues that the district court erred by deciding that Vega had presented enough evidence to support her Title VII claim. We review the district court's determination de novo, *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016), and because Vega was the nonmoving party on the Rule 50 motion, we draw all inferences in her favor. *Reeves*, 530 U.S. at 150.

In a Title VII case, "the sole question that matters" is "[w]hether a reasonable juror could conclude that [the plaintiff] would have kept h[er] job if [s]he had a different ethnicity, and everything else had remained the same." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). A plaintiff can prove discrimination through various types of circumstantial evidence because "[d]irect evidence—an overt admission of discriminatory intent—is rare." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). So, the fact that Vega relied mainly on circumstantial rather than direct evidence is of no moment. What matters is whether she presented enough evidence to allow the jury to find in her favor—and she did.

For instance, Vega introduced evidence that she was an effective employee of the Park District for over 20 years and was promoted multiple times during her employment. The jump straight to termination was not only in tension with Vega's long, favorable record, it violated multiple union commitments. That in itself was important evidence because "[s]ignificant, unexplained or systematic deviations from established policies or practices" can be probative of discriminatory intent. *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012).

Vega also exposed numerous material errors in the Park District's investigation through various forms of testimonial and documentary evidence. For instance, Vega introduced evidence that she was not driving her usual vehicle—the one surveilled by the investigators—on two of the eleven days on which she supposedly falsified her timesheets. That mattered because the investigators relied on the movement of Vega's usual vehicle to track her whereabouts. To rebut another accusation, Vega testified that she was present at the park on the occasion in question but entered the building late because she had found a dead body at the park earlier that morning. The jury could have found these and similar pieces of evidence significant because "flagrant inaccuracies and inconsistencies in the employer's supposed reason" for firing the plaintiff can be evidence of pretext. *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 866 (7th Cir. 2015). And the jury could treat the Park District's lack of interest in Vega's side of the story as similarly significant. Vega presented the investigation as a determined effort to build a case against her rather than a neutral effort to discover the truth. The jury was free to side with Vega by concluding that the charges of timesheet falsification were a pretextual reason for firing her.

In addition to evidence of pretext, the jury heard testimony that the Park District mistreated other Hispanic employees. Millan, Vega's Hispanic former supervisor, testified that she was assigned to "rough" parks on purpose, while Ramirez, another Hispanic employee, told the jury that she retired from her 35-year career at the Park District after a police officer told her that the Park District investigators were watching her and her staff. As we have explained, "'behavior toward or comments directed at other employees in the protected group' is one type of circumstantial evidence that can

support an inference of discrimination." *Hasan v. Foley & Lard-ner LLP*, 552 F.3d 520, 529 (7th Cir. 2008) (citation omitted).

Vega also had evidence that the Park District disciplined Hispanics more harshly than other groups. She introduced data showing that no Caucasian park supervisors were fired between 2005 and 2012, while 17.6% of the Park District's Hispanic park supervisors were fired during that same period. She presented evidence that the Park District's investigation into her alleged falsification of timesheets was far more aggressive than its investigations of non-Hispanic employees accused of similar misconduct. While Vega was surveilled 252 times over the course of 56 days by two different investigators, a Caucasian park supervisor accused of a similar violation was surveilled only three times. And while Vega was fired, the Caucasian park supervisor was not punished even though the Park District concluded that she had lied on her timesheets. Similarly, Vega pointed to two other Caucasian park supervisors, both accused of going to bars during work hours, who were surveilled only during the mornings, when bars are typically closed. Vega also presented evidence that some African-American employees accused of similar timesheet violations were never disciplined at all. *See Boss*, 816 F.3d at 916–17 (holding that the plaintiff can show discrimination under Title VII by presenting "evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment"); *see also Harden*, 799 F.3d at 866 (reasoning that "selective enforcement or investigation" can support a discrimination claim (citation and internal quotation marks omitted)).

The Park District maintains that this evidence is irrelevant because the employees that Vega invoked as comparators were not similarly situated. For instance, the Park District attempts to distinguish a Caucasian park supervisor who was accused of, but not disciplined for, a similar timesheet violation on the ground that she had left the park early in the afternoons during her breaks. But we are hard-pressed to say that this distinction (or the other minor distinctions to which the Park District points) would prevent a reasonable jury from concluding that these employees were similarly situated to Vega. And while the Park District challenges other of Vega's comparators by asserting that they held different positions and were therefore "not subject to the same standards as park supervisors," it offers no explanation of how the standards differed. Without such an explanation, we can't assess the strength of this argument.

The Park District insists that there were two employees who were similarly situated to Vega: two African-American park supervisors who, like Vega, were fired after an investigation into their timesheets. The Park District argues that faced with this evidence, no reasonable jury could have concluded that it treated comparable non-Hispanic employees more favorably than they treated Vega. But a reasonable jury could reject the Park District's contention that the two African-American park supervisors were appropriate comparators. One was fired for theft of time—for which Vega was investigated but not dismissed—and the other was fired after the Park District fired Vega. Given these differences, the jury was free to find that the Park District's treatment of these two African-American park supervisors shed little light on its treatment of Vega.

The Park District launches one final challenge to Vega's Title VII claim: it contends that Vega failed to show a causal link between the discrimination and her termination. Any discrimination, it says, was on the part of the investigators, who were not the decisionmakers. The decisions were made by Simpkins, who fired her, and the Personnel Board, which declined to reverse his decision. Vega introduced no evidence that Simpkins or any other member of the Board personally discriminated against her on the basis of her national origin. To win, therefore, Vega had to show a causal "link between an employment decision made by an unbiased individual and the impermissible bias of a non-decisionmaking co-worker." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011). According to the Park District, Vega failed to do that.

The Park District's argument on this score is confusing and underdeveloped. For starters, it is unclear whether we should treat the Board's rejection of Vega's appeal as the relevant "adverse employment action" for purposes of Vega's Title VII claim. The Park District implies that the Board was the final decisionmaker because it had the power to reverse Simpkins's decision. But it fails to explain why this is so. Simpkins plainly possessed decisionmaking authority; had Vega not appealed his decision to terminate her, his decision would have been final. This distinguishes Simpkins's role from that of the Fire Department Chief in *Woods v. City of Berwyn*, the case on which the Park District hangs its hat—in *Woods*, the Fire Department chief possessed only the power to recommend termination to a Board that made the final decision. 803 F.3d 865, 870–71 (7th Cir. 2015). To conclude that Vega's appeal rendered the Board the final decisionmaker in her case, we need to know how the appellate process worked.

Did the Board's disposition of Vega's appeal reflect its view that Simpkins's decision should remain final? Or did the Board effectively start from scratch and render its own decision about whether Vega should be terminated? The Park District does not point us to the record evidence that would permit us to make that judgment, and we will not hunt for it ourselves. *See Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to … construct the parties' arguments for them.").

Moreover, regardless of whether Simpkins or the Board was the "final decisionmaker" in the Park District's termination process, the dispositive question is whether the discriminatory animus of the investigators and Saieva was a proximate cause of the termination decision. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). As the Court has explained, a "biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* at 421. The Park District does not point us to evidence that would allow us to discern what role the investigative report or Saieva's recommendation played in the Board's review. And again, it is not our job to comb the record to determine whether it supports the Park District's conclusory assertion—really, it is more of an implication—that the Board's review was entirely untainted by either the investigative report or Saieva's recommendation.

We do know, however, what the record reflects about the role of the investigative report and Saieva's recommendation in Simpkins's termination decision. Even if Simpkins himself harbored no racial animus, the jury could have easily concluded that his review was too superficial to constitute "a

meaningful and independent investigation." *Schandelmeier-Bartels*, 634 F.3d at 383. After all, Simpkins simply adopted Saieva's recommendation without speaking to anyone else and admitted that he only read the first three pages of the investigative report. A plaintiff has "plenty of room" to convince the jury that a causal link exists, *id.* at 381, and a jury could reasonably find the necessary causal link here.

In sum, the evidence was sufficient to allow a reasonable jury to find in Vega's favor on her Title VII claim.

## B.

The Park District also argues that the district court's evidentiary errors deprived it of a fair trial, thereby entitling it to a new one. "A new trial is appropriate where the verdict is against the clear weight of the evidence or the trial was not fair to the moving party." *Johnson v. Gen. Bd. of Pension & Health Benefits of the United Methodist Church*, 733 F.3d 722, 730 (7th Cir. 2013). We review evidentiary rulings for an abuse of discretion and reverse a district court's denial of a motion for a new trial only if there is a significant chance that any error "affected the outcome of the trial." *Smith v. Hunt*, 707 F.3d 803, 807–08 (7th Cir. 2013); *see also Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013). This case does not present such a rare instance.

Although the Park District challenges numerous evidentiary rulings by the district court, only one warrants even a brief discussion: the district court's decision to allow the jury to view and listen to dozens of surveillance video clips. The Park District complains that most of these clips were neither authenticated nor admitted into evidence. This challenge is hard to take seriously because it essentially begins and ends

with this conclusory statement. Notably, despite its vehement complaints that the surveillance videos were not authenticated, the Park District does not contend that the tapes were anything other than what Vega said they were: footage taken by the Park District investigators who surveilled her. So far as we can tell, the Park District's real problem with the videos is that they were "irrelevant and prejudicial." Presumably the Park District means that the probative value of the videos was substantially outweighed by the risk that they would unfairly prejudice the Park District. *See* FED. R. EVID. 403. Yet the Park District does not even cite Rule 403, much less develop an argument as to why allowing the jury to see the videos violated that rule, much less explain why any error was not harmless. Given the lack of argument from the Park District, we have no basis for concluding that the district court abused its discretion by permitting the jury to see the videos, let alone that any error warrants reversal.[1]

## C.

The Park District maintains that the district court should have remitted Vega's damages from the jury's original

---

[1] The Park District also argues that the district court erred when it took judicial notice of the 2010 U.S. Census data about the Hispanic population in Chicago, allowed testimony regarding the ethnicity of the Park District's employees in 2015, excluded details of Vega's administrative appeal, and excluded evidence of a phone call between Vega's counsel and the Park District's former Labor Counsel in 2012. These challenges, however, go nowhere. Even if every one of these evidentiary rulings was an abuse of discretion, the Park District makes only the feeblest attempt to show that there is a significant chance that these supposed errors, either singly or together, "affected the outcome of the trial." *Smith*, 707 F.3d at 807–08.

$750,000 grant to less than the statutory maximum of $300,000 under Title VII. We review this decision for abuse of discretion, considering "whether the award is monstrously excessive, whether there is no rational connection between the award and the evidence, and whether the award is roughly comparable to awards made in similar cases." *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483–84 (7th Cir. 2003) (citation and internal quotation marks omitted). Deference is particularly appropriate if, as was the case here, "the district court, which had the benefit of witnessing trial, itself remitted the jury's award to an amount that it determined was commensurate with the evidence in the present case viewed in light of comparable cases." *Deloughery v. City of Chicago*, 422 F.3d 611, 620 (7th Cir. 2005).

Vega testified extensively about the emotional, mental, and physical distress that she suffered for the final six months of her employment. She also testified that she was unemployed for a year and constantly worried about her inability to afford necessary medication and to support her mother. The award is rationally related to this testimony and is not monstrously excessive. *See Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001) (holding that the plaintiff can support an award for nonpecuniary loss by relying solely on her own testimony about her emotional distress).

The award is also sufficiently comparable to those made in similar cases. That is not to say that it is an exact match—but it doesn't have to be. We have explained that "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive. Due to the highly fact-specific nature of Title VII cases, such comparisons

are rarely dispositive." *Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 566 (7th Cir. 2006) (citation and internal quotation marks omitted). And here, the "reference point" of other cases shows this award to be roughly comparable to other awards supported by "first- and third-person testimony regarding ongoing emotional and physical effects of the discrimination." *Schandelmeier-Bartels*, 634 F.3d at 390 (collecting cases). For instance, in *Farfaras*, we upheld the jury's decision to award the plaintiff $200,000 for loss of dignity, humiliation, emotional distress, and pain and suffering when that emotional distress was supported by testimony highlighting the fact that the plaintiff "lost self-esteem, gained weight, [and] had problems sleeping" as a result of the discrimination. 433 F.3d at 563; *see also Deloughery*, 422 F.3d at 621 (concluding that a $175,000 award is comparable to lesser awards granted in other Title VII cases).

While remitting Vega's damages to the statutory maximum was undoubtedly generous, we cannot say that it was an abuse of discretion. We therefore affirm the award.

### D.

The Park District also argues that the district court erred when it awarded Vega back pay and benefits in lost salary, lost bonuses, and lost health insurance premiums. Specifically, the Park District argues that the award was erroneous because Vega did not mitigate her damages by searching for comparable employment in her field. In order to prevail on a failure-to-mitigate argument, the defendant must make two showings: (1) that the plaintiff was "not reasonably diligent in seeking other employment," and (2) that "with the exercise of reasonable diligence there was a reasonable chance that the [plaintiff] might have found comparable employment."

*EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990).
This is an affirmative defense, and once the district court de-
termines that the defendant has failed to meet its burden,
"[w]e shall not disturb that determination unless it is clearly
erroneous." *Id.* The district court found that the Park District
failed both prongs. We agree.

As for the first prong, the Park District argues that Vega
did not exercise reasonable diligence in finding a comparable
job because she did not apply for jobs in the narrow field of
recreation in municipal parks. The district court disagreed. It
found that Vega exercised reasonable diligence because she
applied for over 100 jobs after she was fired. While not all the
jobs she applied for were comparable to her job as a park su-
pervisor, many of them involved working with youth or oth-
erwise engaging with the community. Thus, the district court
determined that the Park District failed to meet the first
prong. Besides—as the district court correctly noted—the
Park District all but ignores the second prong because it pro-
vides virtually no evidence that Vega would have been suc-
cessful in obtaining a sufficiently comparable job in the nar-
row field of recreation in municipal parks even if she had
tried. We affirm the district court's award of back pay and
benefits.

E.

Finally, the Park District argues that the district court's
award of a $55,924.90 tax component is flawed because the
district court offered no explanation for its calculation. Here,
we agree with the Park District—the district court abused its
discretion. *EEOC v. N. Star Hosp., Inc.*, 777 F.3d 898, 904 (7th
Cir. 2015).

In Title VII suits, the district court has the authority to grant a tax-component award—a payment geared toward easing the increased tax burden that results from a lump-sum award of back pay. *Id.* at 903–04. But the district court must exercise that authority in a way that permits appellate review. *Id.* at 904 (affirming a similar tax-component award while urging district courts to explain their calculations when granting such awards). In *North Star Hospital*, we affirmed a $6,495 award as a "modest, equitable remedy" even though the district court did not explain its decision. *Id.* That said, we emphasized that "[s]ilence on the issue tends to frustrate appellate review, and it would be wise for district courts to show their work if and when they adjudge similar tax-component awards in the future." *Id.*

The district court in this case did not explain how it arrived at the $55,924.90 figure, which was substantially higher than the amount that Vega had originally requested. She initially sought a tax-component award of $30,531.27, but the district court denied that request because it could not determine how Vega calculated that amount. After supplemental briefing on the issue, Vega revised her calculation and proposed this $55,924.90 figure. The district court accepted Vega's revised proposal without saying why.

On appeal, Vega attempts to justify the figure by referencing some of her submissions to the district court. But even after reviewing those documents, we are unable to readily discern whether the calculation is accurate. So, because the district court failed to explain its calculation and $55,924.90 is more than nine times the modest award we affirmed in *North Star Hospital*, we vacate the award and remand for the district court to show its work.

II.

We now turn to Vega's cross-appeal. Vega argues that the district court was wrong to grant the Park District's Rule 50(b) motion for judgment as a matter of law on her § 1983 claim. As we did for Vega's Title VII claim, we review the district court's decision de novo, *Empress Casino Joliet Corp.*, 831 F.3d at 822, and construe the evidence in Vega's favor. *Reeves*, 530 U.S. at 150.

At trial, Vega argued that the Park District was liable under § 1983 because it had a widespread custom of discrimination against Hispanics. *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690–91 (1978) (holding that municipalities "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels"). To prevail on this theory, she had to show both that the custom was widespread and that the local policymakers were aware of the custom and took no measures to correct it. *Doe v. Vigo Cty.*, 905 F.3d 1038, 1045 (7th Cir. 2018); *see also Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (holding that, in addition to proving a widespread custom, the plaintiff must show that the policymakers were "aware of the risk created by the custom or practice and … failed to take appropriate steps to protect the plaintiff").

The district court held that Vega's § 1983 claim failed as matter of law because even if Vega had sufficient evidence of a widespread custom of discrimination against Hispanics, she had insufficient evidence to show that any "policymaker" knew about it. Vega challenges this conclusion on appeal, arguing that she presented ample evidence to permit a jury to

find that Simpkins, the Park District's Director of Human Resources, was a policymaker and that he was aware of the pervasive discrimination.

We need not wade into the "policymaker" question, though, because Vega failed to show that there was a widespread custom of discrimination against Hispanics in the first place. *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 312 (7th Cir. 2011) ("It is well established that we may affirm the result below on any basis that appears in the record, even if it was not the district court's ground for dismissing the suit."). Her case that "[t]he offending custom [was] widespread and well settled" relied heavily on uninformative demographic data. *See Vigo Cty.*, 905 F.3d at 1045. For instance, she emphasized that neither the Human Resources Department nor the Investigations Department employed any Hispanics and that several Hispanic employees were replaced by non-Hispanics. But we have previously cautioned against relying on similar statistical evidence because it lacks critical context such as the ratio of qualified Hispanics who actually applied for the relevant positions. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 829 (7th Cir. 2006) (holding that "without knowing how many positions became available during the relevant time frame, the number and race of the candidates applying for those positions, and the candidates' relative qualifications," statistical evidence about the racial demographic of a workplace is "next to worthless" (citation and internal quotation marks omitted)). Similarly, during the trial, Vega relied on a comparison between the data in the 2010 U.S. Census and the ethnic demographic of the Park District to highlight the comparatively low ratio of Hispanic employees at the Park District. But this piece of evidence tells us even less about the Park District's hiring practices because

the census data encompasses many more people than just the relevant market for Park District employees. *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 299 (7th Cir. 1991) (highlighting the significance of limiting the data to the "relevant labor market" when making similar inferences about an employer's hiring practice).

Vega had other evidence that was more helpful, but it still fell short of establishing the kind of "widespread custom" necessary for municipal liability under § 1983. For instance, Millan, Vega's Hispanic former supervisor, Ramirez, a Hispanic employee, and Vega herself all testified that the Park District treated them poorly compared to their non-Hispanic counterparts. Yet a handful of instances does not itself demonstrate a well-settled practice, *see Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002), and Vega's other data did not carry her much farther. She pointed out that between 2005 and 2012, the Park District fired 17.6% of its Hispanic park supervisors and none of its Caucasian park supervisors. But the force of this data is limited by the size of the group: the numbers mean that the Park District fired three Hispanic park supervisors in a seven-year period. Nor did the testimony of Vega's union representative sufficiently move the needle. He stated that over a ten-year period, he did not represent any Caucasian park supervisors in disciplinary or investigative meetings before the Park District. This data lacks context—for example, it's not clear how many such meetings occurred during this period. Even putting that aside, however, the combined force of this testimony and Vega's other evidence fails to establish a widespread practice of discrimination against Hispanics that was "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)

(quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

It is true that Vega had enough evidence to permit a reasonable jury to find in her favor on her Title VII claim for discrimination on the basis of national origin. But the standard of liability is different under § 1983, and the district court correctly concluded that Vega's evidence of discrimination did not satisfy it.

* * *

In sum, we AFFIRM the district court's denial of the Park District's motion for judgment as a matter of law on Vega's Title VII claim, its decision to remit Vega's compensatory award to $300,000, and its award of back pay and benefits. We VACATE the district court's tax-component award and REMAND with instructions to the district court to explain its calculation. We AFFIRM the district court's judgment as a matter of law on Vega's § 1983 claim.